STATE, *ex rel.* WEST VIRGINIA STATE LODGE, FRATERNAL

ORDER OF POLICE, *et al.*

*v.*

THE CITY OF CHARLESTON, *et al.*

(No. 10139)

Submitted October 4, 1949. Decided November 29, 1949.

Lovins, Judge, not participating.

Riley, Judge, concurring.

*J. Campbell Palmer, III,* for plaintiffs in error.

*John J. D. Preston, John L. Goshorn,* for defendants in error.

Fox, Judge:

The West Virginia State Lodge, Fraternal Order of Police, Capitol City Lodge No. 74, Fraternal Order of Police, and Herman Fraser and James Gullian, individually, complain of an order of the Court of Common Pleas of Kanawha County, dated May 25, 1948, entered in a mandamus proceeding in which they were relators, and the City of Charleston, a municipal corporation, and R. Carl Andrews, its Mayor, and John T. Moore, its City Manager, were respondents. Said order denied the writ of mandamus prayed for. A writ of error to such judgment was denied by the Circuit Court of Kanawha County, to which order of denial this Court, on February 7, 1949, granted this writ of error.

On February 18, 1948, the relators below, now the plaintiffs in error, filed in said Common Pleas Court their petition, duly verified, seeking a writ of mandamus to compel the City of Charleston, its Mayor and City Manager, to revoke certain alleged appointments of special policemen in the City of Charleston, and for other relief, basing its claim for relief on the provisions of Chapter 57, Acts of the Legislature, 1937, relating to appointments and promotions in paid police departments, and generally providing for a civil service system for police departments in cities of more than five thousand population. The petition filed by relators alleges the existence of the West Virginia State Lodge, Fraternal Order of Police, and that Herman Fraser, a resident of Huntington, West Virginia, and a sergeant in the police department of that city, was its duly elected and authorized president; also the existence of Capitol City Lodge No. 74, Fraternal Order of Police, and that James Gullian, a citizen and resident of the City of Charleston, serving as a patrolman on the police force of said city, was president of said lodge, and that both said officials were authorized to institute the proceedings in the name of their respective organizations; and that the City of Charleston was a municipal corporation organized under the laws of the State of West Vir-

ginia of which R. Carl Andrews was Mayor, and John T. Moore City Manager.

The petition then incorrectly alleges the enactment of Article 5-A, Chapter 8, Code of West Virginia, entitled, "Civil Service for Police Departments" at the regular session of the Legislature in 1947; whereas, in fact, the statute referred to was passed as Chapter 57, Acts of the Legislature, 1937, without incorporation into the official Code of West Virginia as Article 5-A, Chapter 8, although incorporated as such in Michie Code, 1949. At any rate, it specifically alleges the provisions of Section 1 of said Act which provides that:

> "All appointments to and promotions in all paid police departments of cities and municipalities of five thousand population or more, shall be made only according to qualifications and fitness to be ascertained by examinations, which, so far as practicable, shall be competitive, as hereinafter provided. On and after the date this act takes effect no person except the chief of police shall be appointed, reinstated, promoted or discharged as a paid member of said department of any city or municipality in the State of West Virginia subject to the provisions hereof, in any manner or by any means other than those prescribed in this act."

It also alleges the provisions of Section 20 of Chapter 57, aforesaid, which provides that:

> "All acts and parts of acts of the Legislature of the State of West Virginia, general, special, local or municipal charters, or parts thereof, in relation to any civil service measure affecting the paid police departments of any city or municipality inconsistent with this act shall be, and the same are hereby repealed insofar as such inconsistencies shall exist. * * *"

And it further alleges that a provision of the charter of the City of Charleston, designated as Section 85 which provides that:

> "The Mayor shall appoint such number of policemen as are or may be hereafter prescribed by

the city council by ordinance, and the mayor shall have at his discretion, the absolute right and power to dismiss any policeman and appoint another in his stead."

was repealed by Section 20, aforesaid.

The petition then alleges that for some years prior to the filing thereof, the City of Charleston, and its then Mayor, and since May, 1947, its present Mayor and City Manager, had appointed large numbers, to-wit, forty or more, so-called "special policemen" for the City of Charleston; that such appointments had been made to drivers of certain armored cars which carry money to and from banks; to certain private detectives working in, or as a part of the West Virginia Investigation Bureau; to certain other so-called private detectives; and to members of fraternal orders, to city councilmen and to others. Further, that these appointees were permitted to wear badges identical with badges worn by members of the paid police department of the City of Charleston; that they were permitted to give bond, approved by the council of the City of Charleston, to act as such special policemen; permitted in many instances to wear uniforms identical with those worn by the members of the regular paid police department; and to have all of the powers and rights of members of the regular police department, including the power to arrest, the authority to carry concealed and deadly weapons, and to otherwise act as members of the paid police department. Also, that such persons had taken their orders directly from the Mayor, or directly from employers, or had acted in individual capacities. It is alleged that such practice was in violation of the provisions of Article 7, Chapter 61 of the Code, relating to the carrying of dangerous weapons. The petition further alleges that for more than a year prior to the filing thereof the matters aforesaid and the violations of law involved had been called to the attention of the respondents, without any proper steps having been taken to correct the situation alleged to so exist; and averred, in effect, that the Mayor and City Manager of the City of Charles-

ton were under a legal duty to enforce the laws of the State, especially the provisions of Chapter 57 of the Acts of the Legislature, 1937, aforesaid; and to dismiss all special policemen, call in all police badges improperly distributed, and declare null and void all bonds executed by appointees as special policemen; but that they had refused to do so, and continued to disobey such laws and especially to disobey the law in relation to civil service for policemen.

The prayer of the petitioner is that the respondents be commanded:

"\* \* \* to obey the laws of the State of West Virginia as enacted in Article 5-A, Chapter 8, Code of West Virginia, [Chapter 57, Acts of the Legislature, 1937] in that said respondents shall immediately revoke the appointments of all persons heretofore designated as 'Special Policemen' of the City of Charleston, shall immediately call in and take up the police badges given to all such persons, shall immediately revoke the bonds given by such persons to the City of Charleston, shall immediately cause all such persons who are not properly licensed under article 7, chapter 61, Code of West Virginia to possess and carry deadly and concealed weapons to cease to carry such weapons, shall immediately cause all such persons to refrain from wearing uniforms identical to the members of the paid police department of the City of Charleston, and shall immediately cause all such persons to cease making arrests and doing other acts permitted by law only to members of the paid police department of the City of Charleston."

This petition was amended, in respects not here material, by order entered on March 29, 1948.

On February 18, 1948, the day the petition was filed, a rule was awarded against respondents, returnable February 24, 1948, and requiring them to appear and show cause why a peremptory writ of mandamus as prayed for should not issue. On the return day of said rule, the respondents appeared and tendered their return to the rule

aforesaid, by way of joint demurrer, separate and joint motions, and separate and joint answers to the petition filed against them. For some reason these papers were not actually filed until April 17, 1948, but the filing thereof was evidently due to inadvertence, and they were filed on the later date, as and for February 24, 1948.

The demurrer so filed attacks the proceeding on the grounds that: (1) The relators were not legal entities, not qualified persons, and had no status or standing in a court of law; (2) that no legal right on the part of the relators to the writ prayed for was shown; (3) that the requisite for mandamus did not exist and mandamus was not the proper remedy; (4) that the petition failed to allege that respondents had undertaken to grant or issue a state license to anyone to carry a dangerous weapon, or authorized such special policemen to make arrests, or contained any allegation on which could be based relators' prayer that respondents cause persons to cease wearing uniforms and making arrests; and (5) that the petition was vague and uncertain, and the relief prayed for would be impossible of execution and enforcement.

The motions made were, in effect, to dismiss on the alleged ground that the relators, West Virginia State Lodge, Fraternal Order of Police, and the Capitol City Lodge Number 74, Fraternal Order of Police, were disqualified as proper parties, and disqualified because of lack of interest in the subject matter; that the individual relators, Herman Fraser and James Gullian, represented no group or class and had no personal interest in the subject matter; that the respondent, City of Charleston, did not possess the power or authority to take affirmative or negative action in respect to the subject matter of the petition; and that the relief prayed for was beyond the power and authority of either R. Carl Andrews, Mayor, or John T. Moore, City Manager, to grant.

The answer is lengthy and involved, but in general it denies that the respondents had in any way violated the provisions of the civil service statute, Chapter 57, Acts of

the Legislature, 1937; or that they had authorized the violation by any party of the provisions of Article 7 of Chapter 61 of the Code. It admits the existence of special guards employed by various business interests in the City of Charleston to protect their property; but denies that at any time, by appointment or otherwise, it has clothed any such persons with the authority of regularly paid policemen. It admits that it found such a situation in existence at the time respondents Andrews and Moore took office on May 5, 1947, and also admits that it has done nothing to revoke the authority of any persons assuming to act as special policemen under the supposed authority granted them by former city administrations. It admits that it had issued police badges to five persons acting as jailer and assistant jailers of the City of Charleston; and that on June 10, 1947, a police badge was issued to one Taylor, an employee of an armored service corporation which operates armored cars for the transportation of securities, jewelry and money for banks, mercantile establishments and other members of the public within the City of Charleston; but denies that it has granted or issued to anyone a State license to carry a pistol, revolver or other deadly weapon. It seeks to justify its issuance of badges to jailers and assistant jailers on the provisions of Section 5 of Article 7 of Chapter 61 of the Code, and avers that they had given bonds as such jailers and assistant jailers, and not as special police officers. The answer also avers that:

"* * * the respondents further say that they have not, nor has the administration in which they serve, appointed any special police officers; nor have they issued any permits of any kind for or purporting to appoint, qualify or permit any person to act as a special police officer; nor have they accepted any surety bond of, for or on behalf of any special police officer.

"It is true that certain persons have presented to the Clerk of the City of Charleston surety bonds signed by them, doubtless designed and tendered as special police officer bonds; but these respondents say that said Clerk has not accepted,

filed or made record of any such bonds, that the council of the City has not nor has any other department or member of the city government since the inception in office of these respondents as aforesaid, accepted any such bonds. No such bonds have been approved or accepted by, for or on behalf of the City of Charleston."

Respondents in their answer alleged that they had not, nor had any responsible officer or department of the city government permitted or undertaken to permit anyone, save and except the duly appointed, qualified, and approved and bonded police officers and the jailers of the said city, to bear or carry arms or deadly weapons of any kind; also that there were no special police officers of the City of Charleston other than those attached to the regular force in the police department of said city; that no one other than such officers have been authorized to make arrests within said city, otherwise than in the manner and to the same extent as any private individual and citizen might do so under the laws of the State of West Virginia and the City of Charleston; and that if any persons were unlawfully bearing arms, or undertaking to make arrests, or holding themselves out as members of the police establishment of the City of Charleston, the same had been and was being done without the consent, authority or approval of the respondents.

On these pleadings the parties went to proof, and on the completion of the taking of evidence, the trial court entered the judgment aforesaid.

We are first met with the question of whether the relators are entitled to maintain this proceeding. This question is raised by respondents' demurrer to the petition, and the several motions filed. It is also raised by motion filed in this Court on October 4, 1949, seeking a dismissal of this writ of error on the grounds that the questions raised are now moot. There is filed with said motion to dismiss certain letters which tend to show that the Fraternal Orders here involved are no longer interested in prosecuting this litigation; but there has been filed, in response to said

motion to dismiss, the affidavits of Herman Fraser and James Gullian, the individual relators, in which each of said parties state, in effect, that it is their desire that the case be prosecuted to final decision.

Waiving any irregularity in the motion of October 4, 1949, or the exhibits filed therewith, or the affidavits filed in response thereto, and not passing thereon, we have reached the conclusion that solely on the status of James Gullian, a resident of the City of Charleston and a member of the police force, we should hear and decide this case.

We have been unable to find any legal authority for the institution of the present proceeding on the part of West Virginia State Lodge, Fraternal Order of Police, or Capitol City Lodge No. 74, Fraternal Order of Police, treating them as voluntary societies or associations, and nothing more. They are not legal entities which can either sue or be sued as such. A voluntary association may become a fraternal beneficiary society, and on that basis sue and be sued. Code, 33-8-17; or it may accept a conveyance, bequest or devise of property, and have trustees appointed to control the same under the provisions of Code, 35-2-6, and sue and be sued, as held in *Board of Education* v. *Board of Trustees,* 78 W. Va. 445, 88 S. E. 1099; but the association relators are not shown to come within either of said statutes. Aside from these statutes, we find no statutory or other authority which recognizes a voluntary association or society as a legal entity which may sue and be sued as such. This question was before this Court in *Milam* v. *Settle,* 127 W. Va. 271, 32 S. E. (2d) 269, in which we held:

> "The statute law of this State does not provide for suits or actions against an unincorporated society or association, and, in the absence of such statute, it cannot be sued as an entity by name."

We assume that on the theory of mutuality of remedies, an organization which cannot sue, because not a recognized legal entity, may not itself maintain a suit. This principle seems to be well established in this State, and many cases are cited in the *Milam* case which support this theory.

In our opinion, the relator, Herman Fraser, is disqualified to maintain this proceeding, because any interest he may have in its outcome is too remote to justify his participation therein as a litigant. He is a resident of the City of Huntington, where as the conduct under attack is that of the officials of the City of Charleston. It may be that, as a member of a paid police department, he has an interest in upholding the provisions of what is known as the civil service law, as the same relates to the various police departments of the State in cities of a population in excess of five thousand; but his interest is no different from that of a policeman in Martinsburg, Wheeling or Bluefield, and we think it is too remote to warrant him in instituting this action as an individual. The situation is different in respect to the relator James Gullian. He is a citizen of the City of Charleston, a member of its police force, and supposedly protected by the provisions of the civil service act. We think his interest is direct, and that he has a right to maintain this proceeding to vindicate whatever rights he may have under the civil service statute aforesaid, and on that ground alone we overrule the motion to dismiss, filed October 4, 1949, and sustained the trial court's ruling in overruling the demurrer to the petition of the relators, and the motion questioning the right of relators to institute this proceeding filed with said demurrer.

It cannot be doubted that in past years in the City of Charleston special police were appointed, who gave bond to enable them to carry dangerous weapons, and that such bonds were filed with the city clerk and approved by the city council. Apparently, these appointments were made prior to the decision of this Court in *State ex rel. Crouse* v. *Holdren,* 128 W. Va. 365, 36 S. E. (2d) 481, wherein we held that:

> "The City Council of the City of Beckley has no inherent nor granted power to appoint a privately paid 'special merchant's watchman' who by virtue of that position has the power to bear arms and make arrests within the city's corporate limits."

The situation considered in that case may not be in all respects such as has heretofore existed in the City of Charleston; but we think the principle runs through, and should, in a large measure, control our decision in this case, so far as it concerns the right of the city to appoint special policemen. The *Crouse* case was decided on December 11, 1945, and the answer of respondents shows that they recognize that decision as barring the practice of appointing special policemen, as may have been heretofore practiced. There is some confusion in the record as to what constituted such appointments, and the tenure of the appointee. According to a former official, responsible in part for such appointments, they were construed as ending on the expiration of the bond which was for one year; but there is some evidence that others understood that the bonds were unlimited as to time, and that the appointments continued as to tenure. There is also some confusion, and possible conflict in the evidence, as to whether any appointments as special police have been made since the advent of the present administration on May 5, 1947. As indicated above, a few police badges have been distributed, and others have been called in. There may still be police badges outstanding, the whereabouts of which are unknown, so far as it disclosed by the record; but we cannot escape the conclusion, based on the entire record, that so far as the respondents herein are involved, there has been a good faith effort to comply with what was understood to be the rule laid down in *Crouse* v. *Holdren, supra.* Admittedly, nothing has been done to revoke former appointments, but it is urged that nothing has been done to continue the practice of appointing special officers such as formerly existed. Cohen, the head of the West Virginia Investigation Bureau, understood Mayor Andrews to make an appointment of special police, but Andrews denies this. The chief of police admits that certain badges were given to members of the council, but the record discloses that these have been recalled. There is no evidence that any person, other than regular paid policemen, is permitted to make an arrest; although it is plainly intimated that culprits brought to a police station.

by one of these officers would probably not be released. The evidence in respect to identity of badges and identity of uniforms is vague and unconvincing. Of course, police badges, whether issued by the City of Charleston or by some private detective agency, have in their general aspect the same appearance; and blue uniforms, by whomever worn, are pretty much the same wherever you find them. On the subject of arrest, we think the record shows that, in practice, a person restrained is held until the police authorities are notified. Theoretically, unless to prevent a commission of a felony or other offense involving danger to life or property, no one but a regular police officer has a right to exercise restraint on another; but, in practice at least, persons detected in the commission of a crime are not permitted to escape.

It is clear that persons assuming to act as special police have entered into bonds, and perhaps attempted to file them with the city clerk for approval by the city council. But no such bonds have been approved by the council as was formerly done, and the action of the city clerk in administering what was assumed to be an oath of office, was on the understanding that it was only "for what it was worth," and not an official act of the city. We are thoroughly committed to the principle laid down in *Crouse* v. *Holdren, supra.* We are of the opinion that in respect to the matter of special police or guards, or whatever term may be applied to them, the City of Charleston is without power to clothe such officers with the authority to make arrests, or to carry deadly weapons, or in any other way to use the power of the State as the same may be delegated to regularly appointed members of the police department of any town or city, coming within the civil service act. This being true, it may be that in a proper case mandamus might be invoked to compel the revocation of any such appointments. But, we do not believe the evidence in this case is sufficient to justify the awarding of the writ prayed for. On the evidence, the trial judge refused to award the writ, and his ruling was, in effect, sustained by the Circuit Court of Kanawha County. Giv-

ing to these findings proper weight, we see no reason why we should disturb them.

The prayer of the relators' petition is broad indeed. We are asked to require the Mayor and City Manager to obey the laws of the State of West Virginia; that they immediately call in and take up police badges; revoke bonds; cause people to refrain from carrying dangerous weapons and from wearing certain uniforms and certain badges; and from making arrests. The granting of the writ in the form prayed for would, in our opinion, expand the same to cover matters not heretofore considered as within its purview, to say nothing of the burden it would lay on the City and its officials. Of course, we are not bound to award the writ in the form prayed for, even if we thought some relief was called for. We have the power to mold a writ so as to conform to our decision. But, as we see this case, what we are asked to do is what responsible authorities of the City of Charleston earnestly insist they are doing, except they have not revoked any appointments made by former administrations. They do not controvert relators' position on the law of the case and insist that they recognize its force and intend to be bound thereby. In mandamus there must be clear legal right to the writ, and it is not clear to us that any of the appointments made by former administrations are now in force and effect; and if they are not in effect their revocation at this time would be wasted energy. We are of the opinion that the City of Charleston was, at the date of the institution of this proceeding, attempting, in good faith, to conform to the civil service law, as the same was interpreted, and applied by this Court in *Crouse* v. *Holdren, supra.* This being true, we think the ruling of the Court of Common Pleas of Kanawha County was correct, and its ruling, and that of the Circuit Court of Kanawha County, are affirmed.

*Affirmed.*

RILEY, JUDGE, concurring:

I respectfully concur in the majority opinion of this Court in this case. I agree thoroughly with the principles

enunciated in the first, second, third, fourth, fifth and sixth points of the syllabus. It is my considered opinion, however, that because of the over serious effort to make an inroad on the civil service law of this State and the facts disclosed by this record, this Court should not only enunciate the principles set forth in the opinion, but should mold the writ.

This Court in the case of *State ex rel. Crouse* v. *Holdren,* 128 W. Va. 365, 36 S. E. 2d 481, categorically held: "The City Council of the City of Beckley has no inherent nor granted power to appoint a privately paid 'special merchant's watchman' who by virtue of that position has the power to bear arms and make arrests within the city's corporate limits." By the same token the City of Charleston has no power to appoint any special officer who is not subject to and does not have seniority rights under the civil service law of this State.

There is no question in my mind that the *Crouse* case was and is a landmark in the decisions of this Court in its position sustaining the civil service law of this State, as applied to cities with a population of five thousand or more; and no civil service law has any effect unless it is enforced to the fullest extent.

While I think the record here justifies a molding and awarding of a writ of mandamus in enforcement of the salutary principles enunciated in the majority opinion, I concur in that opinion in deference to the views of the other members of the Court on that question. The record in the instant case, however, fully discloses that bonds have been filed or lodged in the office of the Clerk of the City of Charleston, purporting to permit special officers to carry deadly weapons and to carry out all the functions of paid police officers, which bonds, though not approved or acted upon, have given to certain persons, who are not required to take examinations or follow the civil service law of this State, the apparent right to carry out the position of regularly paid police officers of the City of Charleston.

Though not dissenting to the majority opinion, I think that a writ of mandamus should have been awarded to compel the City of Charleston formally to disapprove the bonds now filed or lodged in the city clerk's office. But whether filed or lodged, the record in this case clearly shows that under the apparent authority of such bonds, there are certain persons in the City of Charleston who, without submitting themselves to the civil service law of this State, are carrying out the functions of regularly appointed police officers, and who, under the cloak of the authority of said bonds, are making arrests and are unlawfully carrying arms in violation of Article 7, Chapter 61, Code of West Virginia.

This record is sufficiently replete with actions on the part of persons who are not regularly appointed police officers under the civil service law of this State, to warrant this Court in molding the writ prayed for and awarding a writ of mandamus to compel the City of Charleston formally to disapprove every bond now filed or lodged in the city clerk's office purporting to authorize special officers to carry deadly weapons and generally to make arrests in the city under the cloak of the apparent authority of such bonds. The power to authorize special officers as well as other persons to obtain a state license to carry deadly weapons resides in the Circuit Court of Kanawha County under Chapter 3, Acts of the Legislature, 1925, Extraordinary Session (Michie's West Virginia Code of 1949, Annotated, Chapter 61, Article 7).